UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MICHELLE LUSSIER,

Plaintiff,

v. Case No.: 2:23-cv-00021-JLB-NPM

CITY OF CAPE CORAL,

Defendant.
_______________________________________/

**ORDER**

This cause comes before this Court upon Defendant City of Cape Coral, Florida's (the "City") Motion for Summary Judgment. (Doc. 37). The Court is fully briefed on the matter.[1] For the reasons explained, the City's Motion for Summary Judgment is **GRANTED.**

**BACKGROUND**

Before the Court recites the facts, it notes that Ms. Lussier has all but disregarded this Court's instructions regarding her response to the City's statement of material facts. (Doc. 25 at 4–5). Not only does Ms. Lussier's brief fail to include pinpoint citations in her briefs to nearly all of her 126 exhibits, she also cites dozens of exhibits for many of her responses to the City's statement of material facts—many of which have no discernable support to the proposition Ms. Lussier asserts.

[1] Plaintiff, Michelle Lussier, filed an Opposition to the City's Motion for Summary Judgment (Doc. 44), and the City replied (Doc. 47).

(Doc. 44 at 2–7; Doc 43-1 through 43-126). While the Court has made best efforts to identify the basis for Ms. Lussier's arguments within the 1,500-page record that she submitted, the Court reminds her that "litigants on summary judgment cannot shift their burden to the Court by simply referring to the existence of 'evidence' in voluminous exhibits, large portions of which are not addressed in their brief, with the expectation that the Court will pinpoint a winning argument for them or unearth beneficial evidence that the filer may have neglected to mention." *Nealy v. Sawyer*, No. 2:21-CV-640-JLB-NPM, 2024 WL 234754, at *2 (M.D. Fla. Jan. 10, 2024) (citing *Chavez v. Sec'y, Fla., Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record.").

Turning to the facts underlying the claims presented, this is an employment discrimination case involving Pop's Café—a cafeteria-style restaurant that the City operates on the first floor of City Hall. (Doc. 37-1 at ¶ 5; Doc. 43-125 at ¶ 5; 43-122 at 9-10). The City staffs Pop's Café, in part, with individuals with disabilities who participate in a job training program administered by the City's Special Populations Division (the "Participants"). (Doc. 37-1 at ¶ 5). The job training program allows the Participants to work at Pop's Café with the assistance of Job Coaches (the "Job Coaches"). (Doc. 37-1 at ¶ 6).

In May 2015, the City hired Ms. Lussier, who is not disabled based on the record before the Court, to serve as the Restaurant Manager of Pop's Café. (Doc. 43-125 at ¶ 3). In her role as manager, Ms. Lussier was responsible for operating the

restaurant and supervising the Participants. (Doc. 37-1 at 6; 43-125 at 5). Ms. Lussier grew "close" to some of the Participants throughout the course of her employment. (Doc. 43-125 at ¶ 6).

While Ms. Lussier's early years of employment in this role as Restaurant Manager appear to have been without serious strife, she did have continuous conflict with the Job Coaches. (Doc. 143-125 ¶¶ 7–9). From Ms. Lussier's perspective, the Job Coaches "refuse[d] to perform their job duties" and were not doing enough to teach the participants new skills. (Doc. 143-125 at ¶ 9). Ms. Lussier claims that "as early as 2015," she "report[ed]"[2] these issues, which she frames as "ongoing discrimination by the Job Coaches against the disabled Participants." (Doc. 43-125 at ¶ 11). According to Ms. Lussier, the City responded to her reports by telling her to "just move on." (Doc. 43-125 at ¶ 13).

Ms. Lussier continued to report her concerns about the Job Coaches' performance in 2018 and 2019 to her then-supervisor, Art Aveleno. (Doc. 43-125 at ¶¶ 10, 16; Doc. 43-28). Mr. Aveleno did "nothing in response" to Ms. Lussier's concerns other than "treat [her] in a hostile manner." (Doc. 43-125 at ¶ 16). Ms. Lussier does not provide any examples of Mr. Aveleno's alleged "hostility" but does claim that a Job Coach once confronted her about "telling on him." (Doc. 43-125 at ¶ 14).

[2] The City disputes that Ms. Lussier ever reported "discriminat[ion]" by Job Coaches against the Participants. (Doc. 37-1 at ¶ 19). However, for the purposes of summary judgment, the Court will infer that Ms. Lussier did report to the City that she believed that the Job Coaches' conduct was discriminatory.

During this same time frame, the Job Coaches also complained to the City about Ms. Lussier's conduct. (Doc. 43-30 at 2–7).[3] For example, a July 2019 report described Ms. Lussier as having been in a "bad mood," which made it "difficult to work [and] uncomfortable." (Doc. 43-30 at 3). A report from August 2019 accused Ms. Lussier of being "rude" (Doc. 43-30 at 2). A September 2019 report described Ms. Lussier as being "*nasty* to the new lady." (Doc. 43-30 at 5) (emphasis supplied).

In January 2020, the City hired Lucille Vailencourt-Kreiger, who replaced Mr. Aveleno as Ms. Lussier's supervisor. (Docs. 43-125 at ¶ 16, 37-1 at ¶¶ 2,4). Ms. Lussier claims she continued reporting the Job Coaches' alleged discrimination to her new supervisor, Ms. Vailencourt-Kreiger. (Doc. 43-125 at ¶ 16). Despite Ms. Lussier's complaints about the Job Coaches, Ms. Vailencourt-Kreiger still gave Ms. Lussier strong performance marks in her May 2020 performance review, with an average score of 4.5 out of 5. (Doc. 43-35).

---

[3] Ms. Lussier denies the City's assertion that "Participants and Job Coaches complained about the manner in which Plaintiff treated them in the workplace. These complaints occurred during the time Mr. Vaillancourt-Kreider supervised Ms. Lu and also pre-dated Vaillancourt- Kreider's employment with the City." (Doc. 37 at 5; Doc. 44 at 4–5). But her denial has no basis in fact. Importantly, Ms. Lussier does not—because she cannot—dispute that the City received numerous complaints about her, spanning multiple years (*See e.g.*, Docs. 43-30, 43-44). Instead, Ms. Lussier attempts to cast doubt on the employees' motivations for lodging the complaints, claiming that her supervisors "persuaded" or "directed the disgruntled Job Coaches to gather information against" her. (Doc. 44 at 4–5). But none of the dozens of exhibits that Ms. Lussier has cited come close to suggesting that the City "directed" or "persuaded" employees to drum up complaints about Ms. Lussier. At most, the record reflects that the City counseled employees to "put conversations in writing if they [had] issues" with Ms. Lussier. (Doc. 43-119 at 54; Doc. 37-5 at 21–24). None of the record evidence suggests that the Job Coaches were encouraged to fabricate untrue stories about Ms. Lussier.

However, throughout 2020, the City continued to receive complaints regarding Ms. Lussier's conduct at Pop's Cafe. (Doc. 37-1 at ¶ 20). For example, on October 21, 2020, one Job Coach submitted a letter complaint to a union representative describing Ms. Lussier's "anger, tone of voice, [and] aggressive body language," all of which made the Job Coach feel "threatened," "bullied," "berated," and "disrespected." (Doc. 43-44 at 3). The Job Coach testified that she submitted this complaint on her own accord and "that letter was [her] idea." (Doc. 37-5 at 20–21). On October 21, 2020, another employee informed the City that Pop's Café was "one of the worst atmospheres [she had] worked in." (Doc. 43-45). The employee attributed this unpleasant environment to her feeling that she was "walking on egg shells," just waiting for Plaintiff to "pounce on something." (Doc. 43-45).

Around the same time the City received these complaints about Ms. Lussier in October 2020, Ms. Lussier elevated her concerns about the Job Coaches by reporting them to Ms. Vailencourt-Kreiger's supervisor, Kerry Runyon and then the City Manager, Rob Hernandez (Doc. 43-125 at ¶ 17; Doc. 43-120 at 54).

Ms. Lussier's conflicts with other employees at Pop's Café continued in 2021. For example, on February 26, 2021, the City received an email from an employee who described several instances where she felt "humiliated" by public ridicule doled out by Ms. Lussier. (Doc. 43-61 at 2–3). Overall, the employee described Pop's Café as "not an enjoyable environment," which she blamed Ms. Lussier for creating.

(Doc. 43-61 at 3).[4] Unsurprisingly, when it came time for Ms. Vailencourt-Kreiger to review Ms. Lussier's performance in May 2021, she rated Ms. Lussier a 3 out 5 for "Operational Standard," noting that "[t]his is an area that [Ms. Lussier] can grow in. Recognizing how to work with staff and participants and using appropriate crucial conversation techniques when communicating with staff in particular to carry out desired tasks." (Doc. 43-66). Overall, Ms. Vailencourt-Kreiger's rating of Ms. Lussier's performance dropped from 4.5 to 3.8 out of 5 between May 2020 and May 2021. (*Compare* Doc. 43-35 *with* Doc. 43-66).

Shortly after receiving her May 2021 performance review, Ms. Lussier filed discrimination claims against the City with the Florida Commission on Human Relations and the Equal Employment Opportunity Commission on June 11, 2021, and June 18, 2021. (Doc. 43-125 at ¶¶ 18–19). Ms. Lussier claims that after she filed these complaints, "the hostile treatment from [her] supervisors increased. Suddenly even little things like [her] efforts to take earned time off were a problem." (Doc. 43-125 at ¶ 19). Specifically, Ms. Lussier asserts that Ms. Vailencourt-Kreiger "questioned" and once "belittled" Ms. Lussier about taking bereavement and Family Medical Leave Act ("FMLA") leave. (Doc. 43-125 at ¶ 20). However, Ms. Lussier admits that all her leave requests were ultimately granted.

---

[4] Ms. Lussier claims that the employee's allegations were "false," but cannot dispute that the employee submitted these allegations in writing to Ms. Vailencourt-Kreiger. (Doc. 43-125 at ¶ 18). Ms. Lussier's affidavit also states that Ms. Vailencourt-Kreiger contacted this employee and others to "solicit them to say negative things about [Ms. Lussier's] job performance." (Doc. 43-125 at ¶ 18). However, Ms. Lussier does not support this allegation with any competent evidence.

(Doc. 43-120 at 89). And it is undisputed that in 2021 Ms. Lussier used 479.5 of the 480 hours of FMLA leave to which she was entitled. (Doc. 37-3 at ¶ 6)

Ms. Lussier also complains that after she sought and took FMLA leave, she lost managerial responsibilities and was, in her words, "demoted." (Doc. 43-125 at ¶¶ 21–22). However, there is no record evidence explaining when or how Ms. Lussier was stripped of her managerial responsibilities, who took them from her, or how long they were taken away.[5] Likewise, there is no record evidence regarding the duration or cause of Ms. Lussier's "delay" in returning to work. Instead, the record establishes that Ms. Lussier did not lose any pay or benefits as a result of her FMLA and, at all times, retained her title, status, and essential job duties. (Doc. 37-1 at ¶ 16).

In November 2021, Pop's Café was scheduled to close temporarily, beginning on November 29, 2021, while it underwent a remodel. (Doc. 37-1 at ¶ 29). Ms. Lussier claims that she was "told"[6] that while Pop's Café was closed, she would

---

[5] The Court notes that Ms. Lussier's affidavit and testimony appear to be in conflict on this point. On the one hand Ms. Lussier averred that her scheduling authority was taken from her after she sought FMLA leave in 2021 (Doc. 43-125 at ¶¶ 21–22), but Ms. Lussier confusingly/contradictorily testified that she "wasn't allowed to make [her] own schedules or do [her] own hiring up until probably 2021, the beginning of 2021." (Doc. 43-120 at 52). The Court is unable to determine when Ms. Lussier believes she had scheduling powers and when she thinks she lost them.

[6] Ms. Lussier does not identify the person who "told" her of this assignment but claims that Ms. Vailencourt-Kreiger gave her a "piece of paper" with the assignment. (Doc. 43-120 at 89). Ms. Vailencourt-Kreiger denies having any knowledge of this purported assignment (Doc. 37-1 at ¶ 29), but for the purposes of summary judgment, the Court will assume that Ms. Lussier would have been required to work at this temporary position while the Café was closed.

receive an alternative temporary work assignment that involved selling cookies in a tent. (Doc. 43-120 at 88; Doc. 43-125 at ¶ 24). Shortly thereafter, on December 1, 2021, Ms. Lussier resigned from her position. (Doc. 37-1 at ¶ 29).

Following her termination, Ms. Lussier filed this action alleging that the City discriminated against her in violation of the Americans with Disabilities Act (the "ADA"), retaliated against her in violation of the ADA and the Florida Civil Rights Act (the "FCRA"), and violated the FMLA. (Doc. 1). Ms. Lussier filed an Amended Complaint (Doc. 15) on February 13, 2023, which is the operative complaint.

**LEGAL STANDARD**

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A moving party is entitled to summary judgment when the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant always bears the initial burden of informing the district court of the basis for its motion and identifying those parts of the record that demonstrate an absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When that burden is met, the burden shifts to the nonmovant to demonstrate that there is a genuine issue of material fact, which precludes summary judgment.

*Id.* The nonmoving party must "go beyond the pleadings and … her own affidavits" and point to record evidence demonstrating a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324. The Court reviews all the record evidence and draws all legitimate inferences in the nonmoving party's favor. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192–93 (11th Cir. 2004).

**DISCUSSION**

**I. ADA Discrimination (Associational)**

In Count I of Ms. Lussier's Complaint, she attempts to state a discrimination claim based on her association with persons with actual or perceived disabilities in violation of the ADA. Under the ADA, "discrimination" is defined as, among other things, "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). Because Ms. Lussier has not proffered any direct evidence of discrimination, the Court applies the familiar *McDonnell Douglas* framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). Under the framework, Ms. Lussier must first establish a *prima facie* claim for associational discrimination by proving: "(1) that she was subjected to an adverse employment action; (2) that she was qualified for the job at that time; (3) that her employer knew at that time that she had a relative [or associate] with a disability; and (4) that the adverse employment action occurred under circumstances which raised a reasonable inference that the disability of the relative [or associate] was a determining factor in the employer's

decision." *Equal Emp. Opportunity Comm'n v. STME, LLC*, 938 F.3d 1305, 1319 (11th Cir. 2019); *Hilburn v. Murata Elecs N. Am., Inc.*, 181 F.3d 1220, 1230–31 (11th Cir. 1999). While the parties do not dispute that Ms. Lussier was qualified to serve as Pop's Café's Restaurant Manager, her claim still fails for two separate and distinct reasons.

**a. Adequacy of Association**

Association discrimination under the ADA "'was intended to protect qualified individuals from adverse job actions based on unfounded stereotypes and assumptions arising from the employees' relationships with particular disabled persons.'" *STME*, 938 F.3d at 1318 (quoting *Oliveras–Sifre v. Puerto Rico Dep't of Health*, 214 F.3d 23, 26 (1st Cir. 2000)). To state an association discrimination claim, a plaintiff must demonstrate that she has a known association with a person who has a known disability. *See* 42 U.S.C. § 12112(b)(4). Here, Ms. Lussier argues that because her "job duties [] included working with the persons with known disabilities," she has met that requirement. (Doc. 44 at 14). There is no question that the City knew that Ms. Lussier served as Pop's Café's manager while the Participants worked there. However, the Court is not convinced that this relationship with coworkers satisfies the type of "association" contemplated by 42 U.S.C. § 12112(b)(4).

When the Eleventh Circuit was presented with the same issue, it looked to the Fourth Circuit's decision in *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205 (4th Cir. 2002) for guidance. *STME*, 938 F.3d at 1319 (noting that the court

found the *Freilich* decision "persuasive"). In *Freilich*, the Fourth Circuit held that a plaintiff-physician could not state an association discrimination claim based on her advocacy for hospital patients with disabilities. 313 F.3d at 216. In so holding, the Fourth Circuit reasoned that if the plaintiff-physician were allowed to proceed with a claim based on "such generalized references to association with disabled persons or to advocacy for a group of disabled persons," every hospital employee would also be a potential ADA complainant. *Id.* And it concluded that "[a] step of that magnitude is for Congress, not this court, to take." *Id.*

Here, Ms. Lussier's connection to the Participants is akin to that of the plaintiff-physician/hospital employee in *Freilich*. Specifically, Ms. Lussier came to know the Participants through her job and does not claim that she had a personal relationship with any of the Participants in particular. (Doc. 43-125 at ¶¶ 4–6). She instead made broad statements complaining about the Job Coaches' general treatment of the Participants. Likewise, Ms. Lussier's advocacy on behalf of the Participants was carried out exclusively in her professional capacity through her work reporting channels, not through her personal relationship with the Participants. (Doc. 43-125 at ¶¶ 11, 13). Accepting Ms. Lussier's position would mean that any person assigned to work with or in a location with persons with disabilities is a potential ADA complainant.[7] Like the Fourth Circuit, this Court believes that such an expansion of ADA protections is best left to Congress.

---

[7] Ms. Lussier's claim that she became close with some of the Participants that she worked with does not change this analysis because many working relationships have a collegial dynamic.

As a result, the City is entitled to summary judgment on Ms. Lussier's associational ADA discrimination claim (Count I).

**b. Adverse Employment Action**

Even assuming that Ms. Lussier was sufficiently associated with the Participants, she still falls short in establishing a prima face case for associational discrimination. Specifically, she has neglected to establish that she suffered an adverse employment action. "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Menzie v. Ann Taylor Retail Inc.*, 549 F. App'x 891, 894 (11th Cir. 2013) (internal quotation omitted).

Ms. Lussier argues that her December 1, 2021, resignation qualifies as an adverse employment action because the City constructively discharged her. (Doc. 44 at 10–13). Ms. Lussier is correct in saying that a constructive discharge is an adverse employment action. Still, she has failed to establish the high standard for her resignation to qualify as a constructive discharge. *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) ("The standard for proving constructive discharge is higher than the standard for proving a hostile work environment."); *Menzie v. Ann Taylor Retail Inc.*, 549 F. App'x 891, 895 (11th Cir. 2013) (explaining that a showing of constructive discharge requires "harassment that is more severe or pervasive than the minimum level required to establish a hostile working

environment"). To prove a constructive discharge under the ADA, "a plaintiff must demonstrate that working conditions were so intolerable that a reasonable person in her position would have been compelled to resign." *Griffin v. GTE Florida, Inc.*, 182 F.3d 1279, 1283 (11th Cir. 1999) (internal quotation marks omitted). "Moreover, whether the working conditions were sufficiently intolerable to amount to a constructive discharge is judged by an objective standard, not the employee's subjective feelings." *Phillips v. Harbor Venice Mgmt., LLC*, 2020 WL 2735201, at *5 (M.D. Fla. May 26, 2020) (citing *Richio v. Miami-Dade Cty.*, 163 F. Supp. 2d 1352, 1367 (S.D. Fla. 2001)). A constructive discharge claim is "not a jury question unless a plaintiff presents substantial evidence that employment conditions were intolerable." *Siudock v. Volusia Cty. Sch. Bd.*, 568 F. App'x. 659, 664 (11th Cir. 2014).

Here, Ms. Lussier argues that she has carried her burden because: "Defendant's employees colluded with the Job Coaches and their supervisor (Doc. 44 at ¶¶ 5–15; Doc. 43-125 at ¶¶17–18) to make Plaintiff's work conditions became increasingly [sic] until a reasonable person would have found the conditions intolerable and quit. (Doc. 44 at ¶15; Doc. 43-125 at ¶¶17–26)." (Doc. 44 at 12). Ms. Lussier points to no other specific facts to demonstrate that her working conditions were intolerable *and* provides no analysis. (*Id.*) As best the Court can discern from Lussier's imprecise citations to various portions of the record, it appears Ms. Lussier intends to rely on her allegations that: (1) the City solicited other Job Coaches to say "negative" things about her performance, resulting her lower

performance review; (2) she was questioned about taking time off from work; (3) around the time Ms. she sought and then took leave, she was "demoted" or lost managerial responsibilities; and (4) when Pop's Café was scheduled to be closed for remodeling, she was given a temporary alternate assignment. (Doc. 43-125 at ¶¶17–26). The Court will examine each of these bases for constructive discharge in turn.

With respect to Ms. Lussier's first allegation that the City "colluded" with other Job Coaches to urge them to submit negative reports about Ms. Lussier, the Court cannot find any record support for Ms. Lussier's contention. To the contrary, the record reflects that the City counseled Job Coaches to "put conversations in writing if they [had] issues" with Ms. Lussier (or anyone else). (Doc. 43-119 at 54; Doc. 37-5 at 21–24). Counseling employees to reduce their concerns to writing is run-of-the-mill human resources advice that, without more, could not have altered Ms. Lussier's working conditions for the worse. *See Errickson v. Lakeland Reg'l Med. Ctr., Inc.*, 2022 WL 3139223, at *4 (M.D. Fla. Aug. 2022) (holding that the plaintiff's assertions that she was written up for unsubstantiated claims and felt isolated because her supervisors repeatedly questioned her fitness for duty were insufficient to state a plausible claim for constructive discharge). While Ms. Lussier's allegations may suggest that the City pressured the Job Coaches to say negative things about her, there is no evidence of that in the record apart from Ms. Lussier's speculation, which she cannot rely on to survive summary judgment. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir.2005) ("Speculation does

not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.”).

Similarly, Ms. Lussier claims that she received a performance review with a “low rating” for the first time in May 2021. (Doc. 43-125 at ¶ 18). However, the record demonstrates that Ms. Lussier’s overall performance score marginally dropped—less than one point—between 2020 and 2021. The Court cannot find that a single, moderate variation in Ms. Lussier’s performance rating gave rise to a constructive discharge. Indeed, the Eleventh Circuit has held that even “repeatedly receiving poor evaluations . . . does not rise to the level of such intolerable conditions that no reasonable person would remain on the job.” *Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001).

Next, Ms. Lussier claims that the City “questioned” her or made it “a problem” when she tried to take leave for bereavement or family medical leave. (Doc. 43-125 at ¶¶ 19–20). However, it is undisputed that Ms. Lussier ultimately received the time off she requested for bereavement leave and used 479.5 of the 480 hours of FMLA leave to which she was entitled in 2021. (Doc. 43-120 at 53 (“Q: Were you eventually allowed to take this time off? A.: Yes.”); Doc. 37-3 at ¶ 6). The Court cannot accept that Ms. Lussier’s supervisor’s questions about her need for leave created a work environment that would cause a reasonable person to leave their job, especially because Ms. Lussier cannot demonstrate that she was denied even one hour of paid leave. *See Sawyer v. Jackson*, 505 Fed. App’x 890, 892 (11th Cir. 2013) (affirming summary judgment for an employer where plaintiff

"assert[ed] that she was forced to quit because her direct supervisor made a belittling comment regarding her sick leave, told her that he was considering further disciplinary action against her . . ., refused to authorize a travel request, and once removed her computer from her desk").

Turning to Ms. Lussier's contention that she lost "managerial responsibilities" "and was "essentially demoted" after seeking and then taking FMLA leave, the Court finds Ms. Lussier's claims to be too conclusory to defeat summary judgment. (Doc. 43-125 at ¶¶ 21–23). Ms. Lussier provides no evidence that supports that she was "essentially demoted," and as the City explained. The report supports that Ms. Lussier "returned to the same position she held prior to her leave." (Doc. 37-1 at ¶ 26). What's more, Ms. Lussier's pay, benefits, and title never changed, and no one else ever took her Restaurant Manager position. (Doc. 37-1 at ¶¶ 16, 26). Considering those facts, the Court cannot accept Ms. Lussier's unsupported conclusion that she was "demoted" or lost her "managerial responsibilities." The specific responsibility that Ms. Lussier claims to have lost relates to scheduling. (Doc. 43-125 at ¶ 21). However, Ms. Lussier does not explain: (1) when she lost her scheduling powers; (2) who took these powers from her; or (3) the circumstances that led her to believe she was no longer responsible for creating schedules for herself and her staff. *See Moore v. San Carlos Park Fire Protection & Rescue*, 808 F. App'x 789, 798 (11th Cir. 2020) (holding that when a plaintiff's allegations are "extremely vague" and do not "reference specific dates or circumstances," the plaintiff will not succeed on a claim of constructive discharge).

Furthermore, the Court cannot discern from the record before it, nor does Ms. Lussier explain, why losing her scheduling responsibilities was to her detriment. Simply stated, there is no record evidence that could support a finding that Ms. Lussier was somehow worse off because she was no longer responsible for scheduling. This is underscored by Ms. Lussier's testimony that she did not even have scheduling powers throughout most of her tenure with the City. (Doc. 43-120 at 52). Ms. Lussier's allegations are too conclusory and vague for the Court to conclude that these circumstances support a constructive discharge claim.[8]

Finally, Ms. Lussier also takes issue with her assignment to sell cookies under a tent in the City Hall parking lot.[9] (Doc. 43-125 at ¶ 24). But the context

---

[8] Ms. Lussier has not argued that her loss of "managerial responsibilities," standing alone, was an adverse employment action. But even if she had, she would have still failed to prove up a *prima facie* case for want of any inference that these managerial responsiblities were removed *because* of her association with persons with disabilities. Ms. Lussier has produced no comparator or otherwise argued that her association with disabled persons caused her to lose managerial responsibilities. *See Barber v. Cellco P'ship*, 808 F. App'x 929, 935 (11th Cir. 2020) (an ADA discrimination plaintiff must "point to a proper comparator."). To the contrary, Ms. Lussier has averred that she *repeatedly* advocated for the Participants and that the City was aware of her complaints from 2015 forward. (Doc. 43-125 at ¶¶ 10–11, 16). It would have made little sense for the City to continue to give Ms. Lussier managerial responsibilities for six years while she was associated with persons with disabilities and take them away in 2021 based on her association with the very persons with disabilities disabled persons that the City had known about all along. Therefore, Ms. Lussier also cannot satisfy the critical fourth prong of her *prima facie* case—"that the adverse employment action occurred under circumstances which raised a reasonable inference that the disability of the relative [or associate] was a determining factor in the employer's decision." *Equal Emp. Opportunity Comm'n,* 938 F.3d at 1319.

[9] The City disputes that Ms. Lussier ever received this reassignment, but for the purposes of deciding summary judgment, the Court will assume that she did.

here matters. Ms. Lussier admits that she received this temporary assignment *because* Pop's Café—where she worked—was scheduled to be closed for a period of time while it underwent renovations. (Doc. 43-125 at ¶ 24 (Ms. Lussier admitted that she knew she would be assigned to sell cookies until the Café reopened temporarily)). Ms. Lussier does not claim that this temporary assignment caused her to lose any pay, benefits, or even her job position title. Instead, Ms. Lussier explains that she was unhappy because she would have to work outside, which concerned her because she had been previously diagnosed with skin cancer and she would have preferred a different temporary assignment. (Doc. 43-125 at ¶ 24). Despite Ms. Lussier's personal concerns and preferences, the Court cannot agree that this temporary assignment was sufficiently intolerable to amount to a constructive discharge, particularly when judged by an "objective standard, not [Ms. Lussier's] subjective feelings." *Phillips*, 2020 WL 2735201 at *5. The analysis might be different if Ms. Lussier's reassignment was meant to be permanent or if Ms. Lussier was reassigned while her regular position was still available, but that was not the case here.[10]

---

10 The Court is mindful of the Supreme Court's recent decision in *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024), in which it held that under the anti-discrimination provision of Title VII, a plaintiff who is suing over an allegedly discriminatory workplace transfer "need show only some injury respecting her employment terms or conditions" and "[t]he transfer must have left her worse off, but need not have left her significantly so." *Id.* at 977. While the Eleventh Circuit has not yet applied this standard in the context of adverse employment actions under the ADA, the Court finds that Ms. Lussier's evidence also does not satisfy this lower bar because Ms. Lussier's reassignment was temporary and her regular position to work as manager of Pop's Café was not available because it was being remodeled.

Overall, Ms. Lussier's evidence does not come close to establishing the type of severe or pervasive conduct that our Circuit requires in order to establish constructive discharge. *See Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997) (finding a genuine issue of material fact regarding constructive discharge where the plaintiff was routinely displaced from her job duties, subjected to ageist remarks, was wrongfully denied workers' compensation benefits, and was stripped of all of her preexisted responsibilities, among other things).

Accordingly, the City is also entitled to summary judgment on Ms. Lussier's association ADA discrimination claim (Count I) for this alternative reason.

**II. Retaliation in violation of the ADA and FCRA**

Ms. Lussier also claims that the City retaliated against her in violation of the ADA (Count II) and the FCRA (Count III). The Eleventh Circuit applies the *McDonnell Douglas* burden-shifting framework to ADA and FCRA retaliation claims. *See Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1336 (11th Cir. 2021) (applying *McDonnell Douglas* to FCRA retaliation claim); *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1219 (11th Cir. 2021) (citing *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (applying *McDonnell Douglas* to ADA retaliation claim). To establish a *prima facie* case of retaliation, Ms. Lussier must show that: (1) she engaged in a statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the

---

Therefore, the Court cannot conclude that this temporary assignment left Ms. Lussier "worse off."

first two elements. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001).

Moving straight to the second element to establish a *prima facie* case, this Court again holds that Ms. Lussier has failed to produce sufficient evidence to permit a reasonable jury to find that the City took an adverse employment action against her. To carry her burden, Ms. Lussier must show that "'a reasonable employee would have found the challenged action materially adverse,'" which, in the retaliation context, "means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Williams-Evans v. Advance Auto Parts*, 843 F. App'x 144, 148 (11th Cir. 2021) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). But Ms. Lussier makes *no* argument that she was subjected to any "materially adverse" action that would have dissuaded a reasonable worker from challenging discrimination. (Doc. 44 at 15). Instead, she "respectfully directs" the Court back to her previous argument that she was constructively discharged. (*Id.*).

This is a problem for Ms. Lussier because having already found that the record evidence does not demonstrate that she suffered an adverse employment action in the context of her ADA discrimination claim in the first instance, the Court must hold the same here—particularly in light of the "significant harm" requirement established by the Supreme Court in the context of retaliation

claims.[11] Indeed, post-*Burlington*, employment actions have not been considered materially adverse unless the record showed that they would have affected future pay or job status in some way. *Barnett v. Athens Reg. Med. Center, Inc.*, 550 F. App'x 711, 714–15 (11th Cir. 2013); *Sloan v. Miami Dade Fire Rescue*, No. 18-21517-CIV, 2019 WL 2869067, at *4 (S.D. Fla. July 3, 2019) (holding that denial of outside employment in addition to employee discipline that did not change the plaintiff's pay or benefits were not materially adverse employment actions); *Luna v. Walgreen Co.*, 575 F. Supp. 2d 1326, 1344–45 (S.D. Fla. 2008), *aff'd*, 347 F. App'x 469 (11th Cir. 2009) (holding that the plaintiff-employee was not subject to material adversity even when her employer refused to allow her to use a chair during her work shift, which resulted in the plaintiff-employee seeking medical treatment from an urgent care facility).

Here, Ms. Lussier has not provided evidence that any of the City's challenged actions (*i.e.*, instructing Job Coaches to put their concerns about Ms. Lussier in writing, taking away Ms. Lussier's responsibility for creating schedules[12], questioning Ms. Lussier about her requests for leave, and temporarily assigning Ms.

---

[11] As the Supreme Court recently stated in *Muldrow*, the significant harm requirement set forth *Burlington* is still applicable to retaliation claims. 144 S. Ct. at 976; s*ee also Williams-Evans v. Advance Auto Parts*, 843 F. App'x 144, 148 (11th Cir. 2021) (applying the "material adversity" standard to ADA retaliation claims).

[12] Ms. Lussier makes no argument that creating schedules was a material, or important part of her job. And indeed, the Court finds that it could not have been because Ms. Lussier testified that she was not assigned to make schedules until 2021—six years into her tenure with the City. (Doc. 43-120 at 52).

Lussier to a different position selling cookies outside while Pop's Café was closed for renovations) left her worse off, let alone subjected her to material adversity. This is so because none of the actions that Ms. Lussier complains about resulted in a significant change to her job duties or caused Ms. Lussier to forego some benefit or compensation.

For this reason, Ms. Lussier cannot state a *prima facie* case of retaliation under the ADA or the FCRA, and the City is therefore entitled to summary judgment on Count II and Count III.[13]

**III. FMLA Interference**

To raise an FMLA interference claim, Ms. Lussier "need only demonstrate by a preponderance of the evidence that [s]he was entitled to the benefit denied." *Strickland v. Water Works & Sewer Bd. Of Birmingham*, 239 F.3d 1199, 1206–07 (11th Cir. 2001). When an employee cannot demonstrate any harm as a result of the employer's alleged conduct an FMLA interference claim is ripe for dismissal. *See Callaway v. Lee Mem'l Health Sys.*, No. 2:19-CV-745-SPC-MRM, 2022 WL 93534, at *5 (M.D. Fla. Jan. 10, 2022), *appeal dismissed*, No. 22-10459-DD, 2022 WL 1565122 (11th Cir. Apr. 28, 2022) (dismissing FMLA interference claim because plaintiff-employee was not denied FMLA leave and actually took her FMLA leave entitlements); *Turner v. Alabama & Gulf Coast Ry. LLC*, 286 F. Supp. 3d 1312,

---

[13] The City also argues that Ms. Lussier's *prima facie* case of retaliation fails because she cannot establish the fourth element, causation. (Doc. 37 at 16). The Court need not decide this issue because there is no evidence that Ms. Lussier has suffered an adverse employment action, which is fatal to Ms. Lussier's retaliation claims.

1322–23 (S.D. Ala. 2017) (finding no FMLA interference where defendant-employer called employee 5 to 10 times and told the plaintiff employee that he would "buried on the job" because plaintiff-employee took all of the FMLA leave to which he was entitled).

Here, Ms. Lussier has failed to provide *any* factual analysis to support her interference claim. (Doc. 44 at 18 ("Plaintiff proffered evidence that Defendant interfered with her FMLA rights (¶¶ 17–23). Therefore, summary judgment must be denied.")). Nonetheless, the Court, in conducting its own review of the record and as best the Court can tell from Ms. Lussier's legal arguments, she attempts to support her FMLA interference claim with the following facts: (1) Ms. Vailencourt-Kreiger questioned and once "belittled" Ms. Lussier about her need to take FMLA (Doc. 43-125 at ¶ 20), and (2) Ms. Lussier received conflicting information about how to submit her FMLA request (Doc 43-125 at ¶ 25). But there is no record evidence that Ms. Lussier's requests to utilize FMLA leave were denied. Indeed, Ms. Lussier admitted that all of her FMLA requests were granted. (Doc. 43-120 at 89). What's more, it is uncontroverted that Ms. Lussier "utilized a total of 479.5 of the 480 hours of FMLA leave she was entitled to." (Doc. 37-3 at ¶ 6).

Based on this record, the Court cannot find that Ms. Lussier was denied any benefit to which she was entitled, and her FMLA interference claim therefore fails. While Ms. Lussier may take issue with the fact that her supervisor questioned her about her need for leave, that questioning did not cause Ms. Lussier to lose any of her benefits. Again, the record is clear that Ms. Lussier took all but 30 minutes of

her 2021 FMLA entitlements before she resigned on December 1, 2021. As a result, the City is entitled to summary judgment on Ms. Lussier's FMLA interference claim (Count IV).

**IV. FMLA Retaliation**

Since Ms. Lussier has no direct evidence of FMLA retaliation, she must rely on circumstantial evidence, and the Court will again apply the burden-shifting framework required by *McDonnell Douglas*. *Canalejo v. ADG, LLC*, 2015 WL 404278, at *3 (M.D. Fla. Jan. 29, 2015) (applying framework in the context of FMLA retaliation claim). To establish retaliation, Ms. Lussier must demonstrate that: "(1) [s]he engaged in a statutorily protected activity; (2) [s]he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity." *Strickland*, 239 F.3d at 1207. Ms. Lussier must satisfy *Burlington's* material adversity standard in order to establish that she has suffered an adverse employment decision. *Chandler v. Sheriff, Walton Cnty*., 2023 WL 7297918, at *2 (11th Cir. Nov. 6, 2023) (defining an adverse employment action, for the purposes of a FMLA retaliation claim, as "an action that 'might have dissuaded a reasonable worker' from engaging in protected activity") (quoting *Burlington*, 548 U.S. at 68)).

Ms. Lussier's FMLA retaliation claim fails because, again, viewing the evidence in the light most favorable to her, the record is devoid of evidence of the existence of an adverse employment action. Just as with her ADA retaliation claim, Ms. Lussier refers the Court back to her argument that she suffered a constructive discharge in the context of her ADA discrimination claim. Factually, though, Ms.

Lussier's argument is even weaker when applied to her FMLA retaliation claim. This is because some of the City's challenged conduct Ms. Lussier points to occurred *prior* to the first time she took FMLA leave. Specifically, Ms. Lussier claims that complaints about her performance from 2020 and early 2021 were solicited by the City. (Doc. 44 at 12; Doc. 37-1 at ¶ 20; Doc. 43-45). However, the City could not have solicited these complaints in retaliation for Ms. Lussier taking FMLA leave because she did not request or take FMLA leave until June 2021, long after the complaints were submitted. (Doc. 43-125 at ¶ 20). For this reason, in addition to all of the other reasons articulated *supra* Sec. II, Ms. Lussier's FMLA retaliation claim fails for failure to demonstrate the existence of a materially adverse employment action.

The City is therefore entitled to summary judgment on Ms. Lussier's FMLA Retaliation Claim (Count VI).

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment as to Plaintiff's Amended Complaint (Doc. 37) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment accordingly, terminate all deadlines, deny any pending motions as moot, and close the case.

**ORDERED** at Fort Myers, Florida on August 6, 2024.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE